# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## CIVIL CASE NO. 3:23-cv-00457-MR

| | |
|---|---|
| IN RE: ) | |
| ) | |
| SCHLETTER, INC., ) | |
| ) | |
| Debtor. ) | |
| ——————————————— ) | |
| ) | |
| CAROL BLACK, Plan Administrator ) | |
| of Liquidating Debtor, Schletter, Inc., ) | **MEMORANDUM OF** |
| ) | **DECISION AND ORDER** |
| Appellant, ) | |
| ) | |
| vs. ) | |
| ) | |
| DENNIS BRICE, ) | |
| ) | |
| Appellee. ) | |
| ——————————————— ) | |

**THIS MATTER** is before the Court on the Plaintiff's appeal from the

Bankruptcy Court's order granting summary judgment in favor of the

Defendant. [BK 20-03061, Doc. 88; CV 3:23-cv-00457-MR, Doc. 5].[1]

The rushed launch of a new product left Schletter, Inc. (the "Debtor")

unable to fulfill orders to its customers. Faced with paying liquidated

---

[1] Citations to the record herein contain the relevant document number referenced preceded by "CV 3:23-cv-00457-MR," denoting that the document is listed on the docket in Civil Case No. 3:23-cv-00457-MR; "BK 18-40169," denoting that the document is listed on the docket in Lead Bankruptcy Case No. 18-40169; or "BK 20-03061," denoting that the document is listed on the docket in Bankruptcy Adversary Proceeding No. 20-03061.

damages to its customers, the Debtor filed a petition pursuant to Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of North Carolina. Carol Black (the "Plaintiff"), in her role as plan administrator of the Debtor, sued the Debtor's former CEO, Dennis Brice (the "Defendant"), in an adversary proceeding before the Bankruptcy Court.[2] The Plaintiff asserted that the Defendant is personally liable to the Debtor for its losses because under Delaware law (1) the Defendant breached a duty of loyalty owed to the Debtor, and (2) the Defendant's poor decisions caused the failed product launch. The Bankruptcy Court disagreed, determining that the Defendant did not breach any duty of loyalty owed to the Defendant, and that the Defendant's actions were protected by Delaware's business judgment rule. Accordingly, the Bankruptcy Court granted summary judgment in favor of the Defendant. For the following reasons, this Court affirms.

I.

Section 158(a)(1) of Title 28 gives federal district courts jurisdiction to hear appeals "from final judgments, orders, and decrees" entered by bankruptcy courts. 28 U.S.C. § 158(a)(1). "The Bankruptcy Court's

---

[2] Before the Bankruptcy Court, the Plaintiff also named two other defendants who are not parties in the present appeal. [See BK 20-03061].

conclusions of law are reviewed *de novo* and its findings of fact are reviewed for clear error." Campbell v. Hanover Ins. Co., 457 B.R. 452, 456 (W.D.N.C. 2011); In re Jenkins, 784 F.3d 230, 234 (4th Cir. 2015).

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable" factfinder could render a verdict in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n. 3. The nonmoving party may not rely upon mere allegations or denials of allegations in her pleadings to defeat

3

a motion for summary judgment. Id. at 324. Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in the record. See id.; Fed. R. Civ. P. 56(c)(1)(a). Courts "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." E. Shore Mkt. Inc. v. J.D. Assoc.'s, LLP, 213 F.3d 174, 180 (4th Cir. 2000). The nonmoving party must present sufficient evidence from which a reasonable factfinder "could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. Facts, however, "must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). On appeal, this Court may only consider "evidence which was presented before the bankruptcy court and made a part of the record." In re Bartlett, 92 B.R. 142, 143 (W.D.N.C. 1988) (citations omitted).

4

II.

A.

Because the Plaintiff appeals the Bankruptcy Court's order granting summary judgment for the Defendant, this Court recites the following undisputed forecast of evidence in the light most favorable to the Plaintiff.[3]

The Debtor, a supplier of solar racking systems, was an American corporation incorporated in Delaware with its principal place of business in Shelby, North Carolina. [BK 20-03061, Doc. 74-1 at 8; BK 20-03061, Doc. 74-2 at 2; BK 18-40169, Doc. 416 at 26]. The Defendant became the Debtor's President and Chief Executive Officer ("CEO") in May 2014. [BK 20-03061, Doc. 74-1 at 4].

The Debtor is part of the "Schletter Group," which consists of solar mounting systems production facilities and sales offices all over the world that all operate under a parent company called Schletter Germany. [BK 18-40169, Doc. 416 at 27]. Before the Debtor filed in Bankruptcy Court, Schletter Germany owned 95% of the Debtor's common stock, with the other

_____

[3] In her appellant brief before this Court [CV 3:23-cv-00457-MR, Doc. 5], and her memorandum in response to the Defendant's Motion for Summary Judgment before the Bankruptcy Court [BK 20-03061, Doc. 81], the Plaintiff heavily cites to her Amended Complaint [BK 20-03061, Doc. 38; CV 3:23-cv-00457-MR, Doc. 5-1 at 11-42]. Any cites to the Complaint are allegations, not evidence. The Court will not consider any such allegations at the summary judgment stage of this case. See Celotex Corp., 477 U.S. at 324.

5

5% "put into the treasury of the company" and not owned by anyone, which is a normal practice under German law. [BK 18-40169, Doc. 416 at 27; BK 20-03061, Doc. 74-1 at 6-7].

In 2016, the Debtor began to lose customers in the American market because the company lost its competitive advantage with one of its products, the FS Uno. [BK 20-03061, Doc. 74-1 at 12-15]. The Defendant consulted a large customer to explore ways to improve the FS Uno, and ultimately decided to develop a new product: the G-Max. [Id. at 11-14]. With the G-Max, the Defendant aimed to make the Debtor's racking system "cheaper, lighter[,] and easier to install, and thus more competitive in U.S. market conditions." [BK 20-03061, Doc. 74-2 at 6].

As the Debtor's CEO, the Defendant was "subject to the control of [Schletter Germany's] Board of Directors." [BK 20-03061, Doc. 74-3 at 11]. Thus, the Defendant could not proceed with the production of the G-Max under the Debtor's bylaws without Schletter Germany's permission. [BK 20-03061, Doc. 74-2 at 7-8]. Following "nearly six months of analysis and investigation," in October 2016, the Defendant and other employees of the Debtor presented a proof of concept to Schletter Germany's board. [Id. at 6]. After the presentation, Schletter Germany's board approved continued development and production of the G-Max. [Id.]. Moving forward, the

6

Defendant kept Schletter Germany informed of the progress made on the G-Max, and of the anticipated launch. [BK 20-03061, Doc. 74-2 at 10].

Before the development of the G-Max, the Debtor paid a licensing fee to Schletter Germany based on revenue derived from sales of the FS Uno. [BK 20-03061, Doc. 81-1 at 16]. Seeing the G-Max as a simple modification of the FS Uno rather than a new standalone product, the Defendant permitted the Debtor's continued payment of a licensing fee to Schletter Germany based on revenue derived from sales of the G-Max. [Id. at 16-18]. The Defendant did so even though the G-Max had a new purlin (horizontal beam), configuration, and design, and was built with new material. [Id.].

Under the Defendant's leadership, the G-Max's development, production, and launch all failed. The Debtor's customer contracts promised ambitious delivery dates, which the Debtor had difficulty meeting. Those contracts also had substantial liquidated damages provisions. Hence, the Debtor rushed production. [BK 20-03061, Doc. 81-2 at 12; CV 3:23-cv-00457-MR, Doc. 5-1 at 563].[4] Additionally, the Defendant did not initiate any testing on the G-Max, which further complicated the production process and

---

[4] Before this Court, for the assertion that the G-Max contract contained large liquidated damages clauses, the Plaintiff cites to a deposition that was not presented to the Bankruptcy Court. [CV 3:23-cv-00457-MR, Doc. 5 at 11; see BK 20-03061, Doc. 81]. The Defendant does not object to the use of this evidence. The Court's consideration of this evidence will not affect the disposition of this case.

7

caused the Debtor to underestimate (1) the cost of the G-Max, (2) the Debtor's capacity to produce the G-Max, and (3) how difficult it would be for customers to install the G-Max. [BK 20-03061, Doc. 81-2 at 3-4, 7, 9-10, 13-14; BK 20-03061, Doc. 81-3 at 3-4]. Delays in production made the Debtor unable to fulfill its orders to its customers, leading to customers filing financial claims. [BK 20-03061, Doc. 81-2 at 14].

The Defendant was fired for cause on June 27, 2017. [BK 20-03061, Doc. 74-2 at 13; BK 18-40169, Doc. 1].

## B.

On April 24, 2018, the Debtor filed a bankruptcy petition pursuant to Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of North Carolina. [BK 18-40169, Doc. 1]. On September 11, 2019, the Plaintiff was appointed as the plan administrator of the Debtor pursuant to an Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation, which the Bankruptcy Court confirmed on November 24, 2020. [BK 18-40169, Docs. 416, 470].

On October 22, 2020, the Debtor filed an adversary proceeding against, *inter alia*, the Defendant. [BK 20-03061, Doc. 1]. On February 11, 2021, the Plaintiff was substituted for the Debtor in the adversary proceeding. [BK 20-03061, Doc. 18]. On March 2, 2023, the Defendant filed a Motion for

8

Summary Judgment [BK 20-03061, Doc. 73], which the Bankruptcy Court granted on July 5, 2023 [BK 20-03061, Doc. 88]. This appeal followed on July 19, 2023. [BK 20-03061, Doc. 90; CV 3:23-cv-00457-MR, Doc. 1]. Having been fully briefed [CV 3:23-cv-00457-MR, Docs. 5, 6, 8], this matter is ripe for disposition.

III.

It is undisputed that Delaware law governs the disposition of this case.

Corporate officers owe fiduciary duties of care and loyalty. Firefighters' Pension Sys. v. Found. Bldg. Materials, Inc., 318 A.3d 1105, 1138 (Del. Ch. 2024).[5] When evaluating claims for breach of fiduciary duty, Delaware courts distinguish between the "standard of conduct" and the "standard of review." Chen v. Howard-Anderson, 87 A.3d 648, 666 (Del. Ch. 2014) (footnote omitted). "The standard of conduct describes what [officers] are expected to do and is defined by the content of the duties of loyalty and care. The standard of review is the test that a court applies when evaluating whether [officers] have met the standard of conduct." Id. (citation omitted).

---

[5] While duties for corporate directors and corporate officers may vary in some instances, relevant to the fiduciary duties at issue in this appeal, the duties of care and loyalty are the same for corporate directors and corporate officers. Gantler v. Stephens, 965 A.2d 695, 708-09 (Del. 2009); Firefighters' Pension Sys., 318 A.3d at 1138. Therefore, citations to rules for corporate directors and corporate officers are used herein interchangeably.

9

There are three standards of review that Delaware courts apply to determine whether a fiduciary has complied with a standard of conduct: the business judgment rule, enhanced scrutiny, and entire fairness.  Id. (citation omitted).  The business judgment rule, the most forgiving standard of review, applies when fiduciaries are "disinterested and independent."  Chen, 87 A.3d at 667 (citation omitted).  Under the business judgment rule, courts presume that fiduciaries "acted on an informed basis, in good faith[,] and in the honest belief that the action taken was in the best interests of the company."  Firefighters' Pension Sys., 318 A.3d at 1139 (citation omitted).  "Unless one of the elements is rebutted, the court merely looks to see whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives."  Id. (citation and internal quotation marks omitted).  "Only when a decision lacks any rationally conceivable basis will a court infer bad faith and a breach of duty."  Id. (citation omitted).

The intermediate standard of review, enhanced scrutiny, applies in two distinct circumstances: first, when the circumstances surrounding an officer's decision-making process "subtly undermine the decisions of even an independent and disinterested fiduciary," Firefighters' Pension Sys., 318 A.3d at 1140 (citation omitted); and second, when fiduciaries wander into an

area "where stockholders possess rights of their own," calling into question the "allocation of authority" within a company. Id. (citation omitted). Under enhanced scrutiny review, courts look at "the reasonableness of the end that the directors chose to pursue, the path that they took to get there, and the fit between the means and the end." Id. (citation omitted). Officers have the burden to show that they (1) "acted for a proper purpose" and (2) "selected an appropriate means of achieving that purpose." Id. (citation omitted).

The third and most stringent standard of review, entire fairness, applies when an officer operates under an "actual conflict of interest." Id. (citation omitted). Under entire fairness review, courts assess the fairness of the situation as a whole by looking at (1) substance, i.e., the transactional outcome, and (2) procedure, i.e., the means by which an officer reaches a transactional outcome. Id. at 1140-42.

Due to the stark differences between these standards of review, determining which standard of review to apply can oftentimes be outcome determinative. Mills Acquisition Co. v. MacMillan, Inc., 559 A.2d 1261, 1279 (Del. 1989).

IV.

Two issues on appeal concern whether the bankruptcy judge applied the correct standard of review. The first issue is whether the Debtor was a

11

wholly-owned subsidiary of Schletter Germany. The second issue is whether the forecast of evidence gives rise to a so-called "Caremark claim" for breach of the duty of oversight such that the business judgment rule no longer applies.[6] The Bankruptcy Court concluded, based on the undisputed evidence, that the Debtor is a wholly owned subsidiary. It also concluded, based on the forecast of evidence, that there is no genuine issue presented regarding a Caremark claim. If either of these conclusions is erroneous, then this Court must reverse the Bankruptcy Court's judgment and remand the case for the Bankruptcy Court to apply a more stringent standard of review.

The third issue on appeal is whether the forecast of evidence regarding the Defendant's conduct raised a genuine issue of material fact as to whether the Defendant violated the business judgment rule.[7] The Court will only reach this issue if the Court determines that the Debtor was a wholly-owned subsidiary, and if the evidence does not give rise to a Caremark claim.

---

[6] Such claims are referred to as "Caremark claims" because the Delaware Chancery Court first held that directors can be held liable for a breach of the duty of oversight in In re Caremark Int'l, 698 A.2d 959 (Del. Ch. 1996).

[7] In his Response, the Defendant asserts that the Plaintiff waived any argument regarding a breach of the duty of care. [CV 3:23-cv-00457-MR, Doc. 6 at 15]. Yet, the Defendant goes on to extensively argue that the Bankruptcy Court correctly determined that the Defendant did not breach a duty of care. [Id. at 15-22]. The Plaintiff then, in her Reply, argues that the Defendant's actions violated the business judgment rule. [CV 3:23-cv-00457-MR, Doc. 8 at 4-7]. While it appears that the Plaintiff presents no argument regarding a breach of the duty of care in her opening brief, given that the Defendant addresses the argument in his Response, and the Plaintiff addresses the argument in her Reply, the Court will review the issue.

The fourth issue on appeal is whether certain indemnification clauses in the Defendant's employment contract shield the Defendant from liability. [CV 3:23-cv-00457, Doc. 6 at 33-35].

## A.

The Plaintiff first argues that the Defendant acted in the best interest of Schletter Germany, rather than in the best interest of the Debtor, by determining that the G-Max constituted a simple modification of the FS Uno and thus agreeing to continue to pay the same licensing fees to Schletter Germany for the G-Max. [CV 3:23-cv-00457-MR, Doc. 5 at 21-23]. The Plaintiff asserts two reasons as to how the Defendant's actions constitute a breach of the Defendant's duty of loyalty owed to the Debtor: (1) the Plaintiff alleges that the Debtor is not a wholly-owned subsidiary of Schletter Germany and, thus, the Defendant owed the Debtor fiduciary duties separate and apart from those owed to Schletter Germany; and (2) the Plaintiff argues that even if the Debtor was a wholly-owned subsidiary, fiduciary duties run from the parent company to the subsidiary, and the Defendant breached his fiduciary duties owed to the Debtor by acting in the best interest of Schletter Germany. [Id. at 23]. The Court will address each of these arguments in turn.

The undisputed forecast of evidence before the Bankruptcy Court shows that the Debtor was a wholly-owned subsidiary of Schletter Germany. Specifically, the forecast of evidence shows:

> The Debtor's common stock is 95 percent held by [Schletter Germany]. It is noted that under German law it is usual to have shares authorized but not issued. Accordingly, the remaining 5 percent of shares are authorized but not owned by any party.

[BK 18-40169, Doc. 416 at 27; see also BK 20-03061, Doc. 74-1: Deposition of the Defendant at 6-7 ("[The Debtor] was not wholly owned by [Schletter Germany] until after [the former CEO] left the company and his shares were acquired and put into the treasury of the company. I think [the former CEO], if I remember properly, he owned 5 percent of [the Debtor].")].

Even though the Plaintiff's first argument hinges on whether the Debtor was, in fact, a wholly-owned subsidiary of Schletter Germany, the Plaintiff does not define "wholly-owned subsidiary," nor does the Plaintiff attempt to explain how the ownership structure of the Debtor's common stock makes the Debtor anything other than a wholly-owned subsidiary of Schletter Germany. Rather, the Plaintiff argues that simply because Schletter Germany held only 95% of the Debtor's common stock, the Debtor was not a wholly-owned subsidiary of Schletter Germany. [Doc. 5 at 19]. Based on the undisputed forecast of evidence before the Bankruptcy Court that the

14

parent held *all* of the *outstanding* stock of the Debtor, in addition to the undisputed customs of stock ownership under German law (presented to the Bankruptcy Court by the Plaintiff), the Court concludes that the Bankruptcy Court correctly held that the Debtor was a wholly-owned subsidiary of Schletter Germany.

As for the Plaintiff's second argument, the Plaintiff asserts that the Defendant breached his duty of loyalty owed to the Debtor as a wholly-owned subsidiary by acting in the best interest of its parent company, Schletter Germany. The Plaintiff cites no authority for this proposition. If this were the law, it would place corporate officers in an impossible situation. They would be required to act for the benefit of the subsidiary, even if such action was to the clear detriment of its sole shareholder.

Instead of placing corporate officers in such an impossible position, Delaware courts recognize that "in a parent and wholly-owned subsidiary context, the [fiduciaries] of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders." Anadarko Petroleum Corp. v. Panhandle E. Corp., 525 A.2d 1171, 1174 (Del. 1988) (citations omitted). This is because "a wholly-owned subsidiary is to be managed solely so as to benefit its corporate parent." Cochran v. Stifel Fin. Corp., 2000 WL 286722, at *11 (Del. Ch. 2011) (citing

15

_Anadarko_, 525 A.2d at 1174), rev'd on other grounds, Stifel Fin. Corp. v. Cochran, 809 A.2d 555 (Del. 2002).

Here, even if the payment of the licensing fees was in error and Schletter Germany were not actually entitled to receive them, the Defendant's fiduciary duties were owed solely to Schletter Germany. See _Anadarko_, 525 A.2d at 1174. As such, the Defendant did not breach his duty of loyalty. Therefore, this conclusion of the Bankruptcy Court is affirmed.

## B.

The Plaintiff next argues that the forecast of evidence gives rise to a _Caremark_ claim. A _Caremark_ claim for breach of the duty of oversight exists in two situations: (1) where "the [officers] utterly failed to implement any reporting or information system or controls"; or (2) where the officers have "implemented such a system or controls, [and] consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." Stone v. Ritter, 911 A.2d 362, 370 (Del. 2006).[8] Under either scenario, a plaintiff must show that a fiduciary knew that he or she was "not discharging their fiduciary obligations," or

---

[8] The duty of oversight applies to both corporate officers and corporate directors. In re McDonald's Corp. S'holder Derivative Litig., 289 A.3d 343, 358 (Del. Ch. 2023). Therefore, again, the Court will cite to rules for corporate directors and corporate officers interchangeably.

consciously disregarded their responsibilities "such as by failing to act in the face of a known duty to act." In re Citigroup Inc. S'holder Derivative Litig., 964 A.2d 106, 123 (Del. Ch. 2009) (citation omitted).

Typical Caremark claims "arise from a failure to properly monitor or oversee employee misconduct or violations of law." Id. at 123; see In re McDonald's Corp. S'holder Derivative Litig., 289 A.3d 343 (Del. Ch. 2023) (workplace culture condoning sexual harassment); In re Am. Int'l Grp., Inc., 965 A.2d 763 (Del. Ch. 2009) (fraudulent financial statements and criminal activity). The business judgment rule, on the other hand, applies when a fiduciary's *business decisions* are challenged. Firefighters' Pension Sys., 318 A.3d at 1139. Where the facts give rise to a Caremark claim, the business judgment rule does not apply.

Here, the Plaintiff argues that the forecast of evidence gives rise to a Caremark claim because the Defendant breached his duty of oversight by ignoring certain "red flags" leading to the failed launch of the G-Max. [CV 3:23-cv-00457-MR, Doc. 5 at 13-22].

The Delaware Chancery Court has addressed a similar argument in In re Citigroup Inc. S'holder Derivative Litig., 964 A.2d 106 (Del. Ch. 2009). In Citigroup, shareholders brought a Caremark claim against a board of directors for an "alleged failure to properly monitor . . . business risk,

17

specifically [the company's] exposure to the subprime mortgage market," leading up to the 2008 financial crisis. 964 A.2d at 123 (emphasis omitted). The shareholders pointed to several "red flags" that should have alerted the board of directors to the subprime mortgage crisis, including (1) "the steady decline of the housing market and the impact the collapsing bubble would have on mortgages and subprime backed securities"; (2) warnings from the Financial Accounting Standards Board (FASB) that certain loans increased the company's exposure; (3) the rise in foreclosure rates; (4) "several large subprime lenders reporting substantial losses and filing for bankruptcy"; and (5) other firms reporting billions of dollars in losses. Id. at 124. The shareholders argued that because the board's decisions resulted in losses, board members "must have consciously ignored these warning signs or knowingly failed to monitor the [c]ompany's risk in accordance with their fiduciary duties," and therefore breached their duty of oversight. Id. at 127.

Even though the shareholders framed their claim as one arising under Caremark, the Chancery Court recognized that the shareholders' theory "essentially amount[ed] to a claim that the director defendants should be personally liable to the [c]ompany because they failed to fully recognize the risk." Id. When one unpeeled the "lofty allegations of duties of oversight and red flags used to dress up these claims," it was clear that the shareholders

were merely "attempting to hold the director defendants personally liable for making (or allowing to be made) business decisions that, in hindsight, turned out poorly for the [c]ompany." Id. The "red flags" alleged by the shareholders were not sufficient to show that members of the board of the directors knew or should have known of corporate wrongdoing, or that the members had consciously disregarded some duty. Id. at 128. The Chancery Court held that "[t]he warning signs alleged by [the shareholders] are not evidence that the directors consciously disregarded their duties or otherwise acted in bad faith; at most they evidence that the directors made bad business decisions." Id. at 128. Ultimately, the Chancery Court concluded that this type of claim was covered by the business judgment rule. Id. at 131.

Here, as stated previously, the Plaintiff argues that the forecast of evidence gives rise to a Caremark claim because the Defendant breached his duty of oversight by ignoring "red flags" surrounding the launch of the G-Max. [CV 3:23-cv-00457-MR, Doc. 5 at 13-22]. Specifically, the Plaintiff argues that the Defendant knew or should have known that (1) products are typically tested at a small scale before being launched; (2) entering into contracts with large liquidated damages clauses before a product is finished is "reckless"; and (3) trying to launch the G-Max "without having sufficient production capabilities . . . is highly imprudent." [Id. at 16].

19

Like the shareholders in <u>Citigroup</u>, the Plaintiff fails to show that the Defendant knew or should have known of corporate wrongdoing or unlawful behavior, or that the Defendant consciously disregarded some duty. <u>See</u> <u>Citigroup</u>, 964 A.2d at 128. Instead, the Plaintiff, with the benefit of hindsight, asks this Court to review the adequacy of the Defendant's past *business decision*: namely, rushing the launch of the G-Max in an attempt to quickly fulfill customers' orders. This is precisely the type of case that the business judgment rule was created to encompass. <u>See</u> <u>id.</u> at 131. Accordingly, the Court concludes that the Bankruptcy Court correctly determined that the evidence does not give rise to a <u>Caremark</u> claim.

C.

Having determined that the Defendant did not breach any duty of loyalty by purportedly acting in the best interest of the Debtor's parent company, and having also determined that the undisputed forecast of evidence does not give rise to a <u>Caremark</u> claim, the Court will now analyze the forecast of evidence under the business judgment rule.

The business judgment rule stems from the idea that courts are inadequate to retroactively assess whether corporate officers made the "right" decision. <u>Citigroup</u>, 964 A.2d at 124. As previously stated, under the business judgment rule, courts presume that a fiduciary acted in good faith,

20

and simply look to see whether a fiduciary's business decision "was rational in the sense of being one logical approach to advancing the corporation's objectives." Firefighters' Pension Sys., 318 A.3d at 1139 (citation omitted). The business judgment rule is so forgiving that it is considered "as close to non-review as [Delaware] law contemplates." Kallick v. Sandridge Energy, Inc., 68 A.3d 242, 257 (Del. Ch. 2013) (citation omitted).

Here, as the Debtor's business struggled, the Defendant attempted to improve a product to make the Debtor more competitive in the market. The Defendant's efforts ultimately failed. The Plaintiff does not point to any evidence to rebut the business judgment rule's presumption of good faith, and the Defendant's decision to launch a new and improved product to become more competitive in the market was a rational one. As the Bankruptcy Court aptly summarized at the summary judgment hearing:

> [W]hat we're doing now is effectively Monday-morning quarterbacking and suggesting that [the Defendant] shouldn't have done any of the things that [he] did, to which someone in my chair would say, well, what would have happened then? It sounds like [the Debtor] had business problems separate and apart, [with] the cost, competition, and the difficulty of using the product, the UNO system, [the Debtor] might have had just the same problems that we have here and we'd still end up in the same place. I'm not making that finding. I'm just saying it's easy to suggest when a decision goes wrong that it was the improper thing to do.

21

[BK 20-03061, Doc. 99 at 47]. It is not for the Court to retrospectively critique the good faith, rational business decisions made by the CEO of a failing business. See Citigroup, 964 at 124. Accordingly, the Court will affirm the Bankruptcy Court's determination that the business judgment rule shields the Defendant from liability.

### D.

Because this Court concludes that the Bankruptcy Court correctly applied the business judgment rule in this case, and that the business judgment rule shields the Defendant from liability, the Court will not address the Defendant's argument that he is shielded from liability based on certain indemnification clauses contained in his employment contract.

### V.

For the foregoing reasons, the Court will affirm the Bankruptcy Court's Order granting summary judgment for the Defendant in this case.

### **ORDER**

**IT IS, THEREFORE, ORDERED** that the Bankruptcy Court's Order granting the Defendant's Motion for Summary Judgment [BK 20-03061, Doc. 88] is hereby **AFFIRMED**.

**IT IS SO ORDERED.**

Signed: August 5, 2025

Martin Reidinger
Chief United States District Judge